**UNITED STATES of America, Appellee,**

v.

**Gregory Alan KINDER, Defendant–Appellant.**

No. 816, Docket 94–1333.

United States Court of Appeals, Second Circuit.

Argued Jan. 26, 1995.

Decided Aug. 16, 1995.

of 21 grams. Therefore, his sentencing range was 97 to 121 months.[1] However, Kinder was subject to a mandatory minimum sentence of ten years for possessing with intent to distribute ten grams or more of a mixture or substance containing LSD. *See* 21 U.S.C. § 841(b)(1)(A)(v). Because a sentence cannot be lower than a statutorily required mandatory minimum term of imprisonment, no matter what the Guidelines range, Kinder received a sentence of 120 months imprisonment.

On November 1, 1993, the Sentencing Guidelines were amended to alter the method for determining the relevant weight of LSD. Section 2D1.1(c) now provides:

> In the case of LSD on a carrier medium (*e.g.,* a sheet of blotter paper), do not use the weight of the LSD/carrier medium. Instead, treat each dose of LSD on the carrier medium as equal to 0.4 mg of LSD for the purposes of the Drug Quantity Table.

U.S.S.G. § 2D1.1(c). As a result, the Guidelines now provide for a fixed weight of .4 milligram per dose, representing the total weight of both the drug, which is assigned a presumptive weight of .05 milligram, and the carrier medium, which is assigned a presumptive weight of .35 milligram. *See* U.S.S.G. § 2D1.1, comment. (backg'd.). Under Section 2D1.1(c), which may be applied retroactively, *see* U.S.S.G. § 1B1.10, p.s., Kinder's 2235 doses of LSD would be treated as weighing 894 milligrams (2235 × .4 milligram), or approximately .89 gram, rather than the actual weight of 21 grams. Kinder argues that the amendment to the Guidelines also alters the method by which weight is to be calculated for purposes of determining whether the mandatory minimum sentence applies. As a consequence, he argues, the weight of the LSD he possessed is now calculated at less than 10 grams, and he is not subject to the ten-year mandatory minimum sentence of imprisonment. Rather, his sen-

Marybeth McCaffrey, Sessions Keiner Dumont & Barnes, P.C., Middlebury, VT (Bonnie Barnes, Sessions Keiner Dumont & Barnes, P.C., on the brief), for defendant-appellant.

William B. Darrow, Asst. U.S. Atty., Burlington, VT (Charles R. Tetzlaff, U.S. Atty. for the D. of VT, David V. Kirby, Chief, Crim. Div., on the brief), for appellee.

Before: VAN GRAAFEILAND, WINTER, and LEVAL, Circuit Judges.

WINTER, Circuit Judge:

This appeal involves the question of whether an amendment to the United States Sentencing Guidelines altering the method for determining the relevant weight of LSD for Guidelines purposes also alters the method for determining whether a mandatory minimum sentence applies under 21 U.S.C. § 841(b). We hold that it does not.

Gregory Kinder pleaded guilty to distributing LSD. In May 1993, Kinder was sentenced to 120 months of imprisonment for possessing with intent to distribute 2235 tablets of LSD. He now appeals from the district court's denial of his motion to modify that sentence.

At the time Kinder was sentenced, the Sentencing Guidelines provided that the sentencing range depended upon the total weight of the LSD and its carrier medium. Kinder's 2235 tablets of LSD weighed a total

---

1. The 97 to 121 months range imposed under the Guidelines in use at the time of sentencing reflected a base offense level of 32 under Section 2D1.1(c)(6), applicable to an offense involving at least 10 but less than 30 grams of LSD, adjusted downward three levels for acceptance of responsibility under Section 3E1.1(b), in Criminal History Category II.

tence should be within the Guidelines range of 41–51 months. We disagree.

Section 841(b)(1)(A)(v) provides:

In the case of a violation ... involving 10 grams or more of a mixture or substance containing a detectable amount of lysergic acid diethylamide (LSD) ... such person shall be sentenced to a term of imprisonment which may not be less than 10 years....

Before the November 1, 1993 amendment to the Guidelines, the Supreme Court had held that, in determining whether the mandatory minimum sentence applied, the weight of any mixture or substance containing a detectable amount of LSD—that is, the actual total weight of LSD and the carrier medium—was the weight to be used. *See Chapman v. United States,* 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991). The Court concluded that "Congress clearly intended the ... carrier medium to be included in the weight" of the drug where, as in the present case, the carrier is a "mixture or substance containing a detectable amount of the drug." *Id.* at 460, 111 S.Ct. at 1925. The Court thus construed Section 841(b) to mean that "[s]o long as it contains a detectable amount [of LSD], the entire mixture or substance is to be weighed when calculating the sentence." *Id.* at 459, 111 S.Ct. at 1924.

We conclude that the amendment to the Guidelines had no effect on the method of determining weight for the purpose of applying the mandatory minimum sentence. In the Commentary accompanying the revised guideline, the Sentencing Commission expressly stated that the amendment does not affect the determination of drug quantity for purposes of the mandatory minimum sentence statute. The Commentary, which is set out in pertinent part in the margin,[2] must be treated as "authoritative unless it violates the Constitution or a federal statute, or is inconsistent with or a plainly erroneous reading of that guideline." *Stinson v. United States,* —— U.S. ——, ——, 113 S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993). The Commentary states that the new Guidelines method for determining LSD quantities "does not override the applicability of 'mixture or substance' for the purpose of applying any mandatory minimum sentence. (*see Chapman;* § 561.1(b))." U.S.S.G. § 2D1.1 comment. (backg'd).

Kinder urges us to construe the Commentary to mean that the Guidelines new fixed weight-per-dose standard incorporates the holding of *Chapman* requiring inclusion of the weight of the carrier medium, that is to say, the amendment calculates the combined weight of the LSD and the weight of the

2. The pertinent portion of the Commentary states:

   Because the weights of LSD carrier media vary widely and typically far exceed the weight of the controlled substance itself, the Commission has determined that basing offense levels on the entire weight of the LSD and carrier medium would produce unwarranted disparity among offenses involving the same quantity of actual LSD (but different carrier weights), as well as sentences disproportionate to those for other, more dangerous controlled substances, such as PCP. Consequently, in cases involving LSD contained in a carrier medium, the Commission has established a weight per dose of 0.4 milligram for purposes of determining the base offense level.

   The dosage weight of LSD exceeds the Drug Enforcement Administration's standard dosage unit for LSD of 0.05 milligram (*i.e.,* the quantity of actual LSD per dose) in order to assign some weight to the carrier medium. Because LSD typically is marketed and consumed orally on a carrier medium, the inclusion of some weight attributable to the carrier medium rec-

ognizes (A) that offense levels for most other controlled substances are based upon the weight of the mixture containing the controlled substance without regard to purity, and (B) the decision in *Chapman v. United States,* 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (holding that the term "mixture or substance" in 21 U.S.C. § 841(b)(1) includes the carrier medium in which LSD is absorbed). At the same time, the weight per dose selected is less than the weight per dose that would equate the offense level for LSD on a carrier medium with that for the same number of doses of PCP, a controlled substance that comparative assessments indicate is more likely to induce violent acts and ancillary crime than is LSD.... Thus, the approach decided upon by the Commission will harmonize offense levels for LSD offenses with those for other controlled substances and avoid an undue influence of varied carrier weight on the applicable offense level. Nonetheless, this approach does not override the applicability of "mixture or substance" for the purpose of applying any mandatory minimum sentence (*see Chapman;* § 5G1.1(b)). U.S.S.G. § 2D1.1 comment. (backg'd.).

carrier medium, as did *Chapman.* However, the amendment assigns to the medium a fixed weight of .35 milligrams, while *Chapman* held that the actual weight was to govern. The plain meaning of the Commentary thus is that *Chapman*'s holding as to use of the actual weight of the medium continues to apply for purposes of mandatory minimum sentences. If the Commentary meant that the revised approach fully incorporated the holding in *Chapman,* then it would not have used the term "does not override." Nor would it have cited to Section 5G1.1(b), the Guideline that acknowledges the primacy of a statutory mandatory minimum sentence over a Guidelines sentence.

This conclusion is further bolstered by the fact that the Commentary relates only to offense levels, a term relevant to the Sentencing Guidelines but not to mandatory minimum sentences under Section 841(b). The Commentary thus describes the merits of the Commission's approach as "harmoniz[ing] offense levels for LSD offenses with those for other controlled substances and avoid[ing] an undue influence of varied carrier weight on the applicable *offense level* " (emphasis added) just before acknowledging that, "nonetheless," the approach does not "override the applicability of 'mixture or substance' for the purpose of applying any mandatory minimum sentence." The use of the term "nonetheless" indicates that the Commission meant that in spite of the merits of its approach, *Chapman* prevails where pertinent.

Moreover, the Sentencing Commission lacks the authority to displace the *Chapman* method for determining drug quantity under Section 841(b). In *United States v. Palacio,* 4 F.3d 150 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1194, 127 L.Ed.2d 543 (1994), a defendant challenged the definition of cocaine base under Section 841(b) on the ground that a proposed amendment to the Guidelines defined "cocaine base" differently. We held that the Sentencing Commission has no power to change a prior judicial interpretation of the statutory term "cocaine base." *Id.* at 154–55. We further held that, in the absence of new guidance from Congress, we would not reinterpret a statutory term "when our initial construction of a statute is solely

the result of an independent judicial interpretation of a statutory term, rather than deference to the reasonable interpretation adopted by an agency." *Id.* at 154. *Palacio* thus precludes the Commission from altering the *Chapman* rule.

We acknowledge that, because the quantity of actual drug present in each dose is so small, the different calculation methods directed by the Sentencing Guidelines and the mandatory minimum sentence statute may lead to dramatic disparities in offenders' sentences for identical doses of LSD. For example, an offense involving 100 doses of LSD in a carrier medium weighing a total of 10 grams would result in a ten-year mandatory term of imprisonment for a first-time offender. If another first-time offender carried the same number of doses in a carrier medium weighing a total of less than one gram, his or her expected range of imprisonment would be 10 to 16 months, based upon a Criminal History Category of I and a base offense level of 12 (100 $\times$ .4 milligram = 40 milligrams). However, these disparities are entirely a function of Section 841(b) and the *Chapman* decision. Until there is either congressional action or a reinterpretation of that Section by the Supreme Court, *Chapman* governs the meaning of the term "mixture or substance" for purposes of determining LSD quantity under 21 U.S.C. § 841(b), and LSD weight will be calculated for sentencing under a dual weight system.

Our conclusion is identical to that reached by every court of appeals that has considered the issue to date, *see United States v. Boot,* 25 F.3d 52 (1st Cir.1994); *United States v. Hanlin,* 48 F.3d 121 (3d Cir.1995); *United States v. Pardue,* 36 F.3d 429 (5th Cir.1994) (per curiam), *cert. denied,* —— U.S. ——, 115 S.Ct. 1969, 131 L.Ed.2d 858 (1995); *United States v. Andress,* 47 F.3d 839 (6th Cir.1995) (per curiam); *United States v. Neal,* 46 F.3d 1405 (7th Cir.1995) (in banc), *cert. granted,* —— U.S. ——, 115 S.Ct. 2576, 132 L.Ed.2d 826 (1995); *United States v. Mueller,* 27 F.3d 494 (10th Cir.1994); *United States v. Stoneking,* 60 F.3d 399 (8th Cir. 1995) (*in banc* ); *United States v. Pope,* 58 F.3d 1567 (11th Cir.1995), except one, *see*

*United States v. Muschik,* 49 F.3d 512 (9th Cir.1995).

Kinder also contends that, in light of the revision to Section 2D1.1, his sentence is unconstitutional as violative of the Due Process Clause and the Cruel and Unusual Punishments Clause. Neither of these claims was raised before the district court, but they are in any event meritless.

Affirmed.[3]

## LEVAL, Circuit Judge, dissenting:

I recognize that in dissenting, I am rejecting the views not only of my colleagues but also of most of the circuits to have considered this question. This gives me considerable pause. I am persuaded, however, that these decisions result from two significant errors: First, they misconceive the question raised (or, at least, they fail to focus on the question that most favors the defendants' argument). Second, in considering the Supreme Court's decision in *Chapman v. United States,* 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991), they take dictum as holding and read the Supreme Court as having decided an issue which the Court, in fact, never considered.

The majority opinion asserts that the question is "whether an amendment to the United States Sentencing Guidelines altering the method for determining the relevant weight of LSD for Guidelines purposes also alters the method for determining" its weight under the mandatory minimum statute.[1] Ma-

jority op. at 758. The majority asserts, and I agree, that the Commission lacks the power to alter a statute. Indeed, the Commission made clear in the Guidelines Commentary that it did not purport to alter, or even address, the statute.[2] The question so put is easily answered.

In my view, however, the question is quite different. It is whether the courts, in interpreting the mandatory sentence statute, may, and should, voluntarily take guidance from the Sentencing Commission, and adopt its formula for measuring quantities of LSD promulgated for use under the Guidelines.

Strong reasons support affirmative answers to both parts of the question. Courts may, of course, in the interpretation of a statute, adopt an interpretive ruling of an expert administrative body, even if created in a different (but parallel) context, so long as the resulting interpretation is consistent with the commands of the statute. In this instance, the adoption of the Commission's formula would contravene neither the terms of § 841, nor the Supreme Court's interpretation of it in *Chapman.* As to why courts should adopt the Commission's formula: following the guidance of the Commission would avoid interpreting the statute in a manner that produces appalling arbitrary and irrational sentences resulting from morally and functionally irrelevant details; the Commission's rule was prompted by a finding of unwarranted sentencing disparities, which

---

**3.** We do not address the merits of the arguments made by our dissenting colleague because we believe that they are best directed to the Supreme Court.

**1.** Other circuits favoring the majority's position have posed the question similarly. *See United States v. Pope,* 58 F.3d 1567, 1569 (11th Cir. 1995) ("[w]hether Amendment 488 changed the method by which to calculate the weight of LSD for purposes of the statutory sentencing scheme"); *United States v. Andress,* 47 F.3d 839, 840 (6th Cir.1995) ("whether a change in the way the weight of ... [LSD] is determined under the U.S. Sentencing Guidelines effected a corresponding change ... under a statute mandating a minimum sentence"); *United States v. Neal,* 46 F.3d 1405, 1407 (7th Cir.1995) (en banc) ("The sole issue on appeal is whether ... an amendment to the Sentencing Guidelines ... applies to the calculation of a defendant's base offense level

but not to his eligibility for a statutory mandatory minimum sentence."), *cert. granted,* — U.S. ——, 115 S.Ct. 2576, 132 L.Ed.2d 826 (1995); *United States v. Boot,* 25 F.3d 52, 54–55 (1st Cir.1994) (rejecting defendant's argument that "congressional acquiescence in [the adoption of Amendment 488] must be considered tantamount to legislative displacement of the *Chapman* regime"); *United States v. Dimeo,* 28 F.3d 240, 241 (1st Cir.1994) (addressing defendant's argument that "by permitting Amendment 488 to take effect Congress signaled its intention that LSD weight be calculated under a unitary method ... thereby implicitly overruling *Chapman*").

**2.** "Nonetheless, this approach does not override the applicability of 'mixture or substance' for the purpose of applying any mandatory minimum sentence (*see Chapman;* § 5G1.1(b))." USSG § 2D1.1, comment. (backg'd).

occur under the mandatory statute to the same extent as under the Guidelines. Furthermore, to do so would bring sentences governed by the Guidelines and those governed by the mandatory statutes into harmony, while failing to do so will produce intolerable inconsistencies.

### A. The Significance of Amendment 488

Both section 841(b)(1) of Title 21, U.S.C., and the Sentencing Guidelines require courts to determine the weight of "a mixture or substance containing a detectable amount of" LSD. Under § 841(b)(1), an offense involving more than one or ten grams triggers a mandatory minimum sentence of five or ten years, respectively. Under § 2D1.1(c) (Drug Quantity Table) of the U.S. Sentencing Guidelines, the weight of the mixture or substance will determine the defendant's base offense level.

Prior to the adoption of Amendment 488 in 1993, the Guidelines required that offense levels under the Drug Quantity Table be determined by the "entire weight of any mixture or substance containing a detectable amount of [LSD]." *See* USSG 2D1.1(c) n.* (1992). Under the new rule, the Guidelines instruct,

> In the case of LSD on a carrier medium (*e.g.*, a sheet of blotter paper), do not use the weight of the LSD/carrier medium. Instead, treat each dose of LSD in the carrier medium as equal to 0.4 mg of LSD for purposes of the Drug Quantity Table.

USSG § 2D1.1(c) n. * (1993).

The Commentary goes on to explain why this change was made. For reasons peculiar to LSD, "basing offense levels on the entire weight of the LSD and carrier medium *would produce unwarranted disparity* among offenses involving the same quantity of actual LSD (but different carrier weights)." USSG § 2D1.1, comment. (backg'd) (emphasis added). The Commission has therefore "established a weight per dose of 0.4 milligram for purposes of determining the base offense level. The dosage weight of LSD selected exceeds the Drug Enforcement Administration's standard dosage unit for LSD of 0.05 milligram (*i.e.*, the quantity of actual LSD per dose) in order to

assign some weight to the carrier medium." *Id.* The "inclusion of some weight attributable to the carrier medium," the Commentary explains, "recognizes ... the decision in *Chapman* ... (holding that the term 'mixture or substance' in 21 U.S.C. § 841(b)(1) includes the carrier medium in which LSD is absorbed)." *Id.* The change is made in order to "harmonize offense levels for LSD offenses with those for other controlled substances [such as PCP] and *avoid an undue influence* of varied carrier weight on the applicable offense level." *Id.* (emphasis added).

Insofar as it pertains to the Guidelines, the meaning of all this is reasonably clear. The Commission has found that, in the case of LSD, the use of the actual weight of the carrier produces unwarranted disparity in sentencing. Recognizing, however, that under the Supreme Court's decision in *Chapman* the term "mixture or substance" forbids exclusion of the carrier, the Commission has assigned a standard weight to the carrier of 0.35 milligram (seven times the weight of the pure LSD) for each .05 milligram dose of LSD, for a total of .4 milligram. This includes the carrier while "avoid[ing] undue influence of varied carrier weight on the offense level." USSG § 2D1.1, comment. (backg'd).

The question, then, for courts interpreting § 841(b)(1) is whether they may, and should, borrow from the wisdom and expertise of the Commission by adopting its interpretive method for avoiding unwarranted disparity in Guideline sentencing, in order to cure the same problem in sentencing under the mandatory statute.

### B. The irrational results produced by use of the full weight of LSD carriers

Using the actual weight of the carrier medium to quantify the "mixture or substance" produces appalling disparities in LSD sentencing. Functionally irrelevant differences between one carrier and another generate extremely disparate sentences. This is because of properties peculiar to LSD and the way it is sold and consumed. First, the drug itself is infinitesimally light in comparison to

substances often used as carrier. An average dose of pure LSD weighs only .05 milligram.[3] The standard dose of LSD is so tiny that it is difficult to store and transfer separately unless incorporated into a much more substantial carrier.[4] Thus, an individual dose of LSD, consisting of a drop in liquid form, is conventionally placed in a gelatin capsule, or on a small square of blotter paper or a sugar cube, where the liquid evaporates and the remaining crystals bond with the carrier medium.

Second, unlike diluents commonly encountered in the trade of other drugs, carrier media for LSD are not employed to multiply the number of doses by dilution.[5] In the case of heroin and cocaine, inert elements, such as lactose and mannite, are employed to dilute the drug, so as to give the seller a larger volume to sell, eventually resulting in a wider distribution of a larger number of weaker individual doses. Thus, the individual dose purchased by consumers in drug markets will vary substantially in the amount of pure drug they contain. This is not so with LSD, which is sold by the dose, not by gross volume. The individual dose contains a relatively standard amount of pure LSD, regardless whether it reposes on a quarter-inch square of blotter paper, a sugar cube, or in an eight-ounce glass of orange juice. In other words, rather than expand the number of doses that can be served from a fixed quantity of pure drug, the carrier serves to isolate the dose and facilitate its separate storage, transfer, and consumption. *Chapman*, 500 U.S. at 466, 111 S.Ct. at 1928. Furthermore, for ingestion, the LSD is sometimes transferred from its original carrier into a much heavier carrier. Thus, while many consume the tiny dose of LSD by holding the blotter square or sugar cube in the mouth, allowing the drug crystals to dissolve into saliva, some will drop the carrier into a glass of juice or other liquid; the crystals dissolve and the drug is gradually ingested as the drink is consumed. *Chapman*, 500 U.S. at 457, 111 S.Ct. at 1923; *United States v. Marshall*, 908 F.2d 1312, 1332 (7th Cir.1990) (en banc) (Posner, J., dissenting), *aff'd sub nom. Chapman v. United States*, 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991).

These characteristics of LSD produce bizarre irrationalities of two types when one measures "mixture or substance" by reference to the actual weight of the carrier: one resulting from the use of one carrier as opposed to another; the second involving the comparison of sentences for LSD offenses with offenses for other drugs. The weight of the actual LSD is so slight that anything short of 20,000 doses in pure liquid form will not reach the one gram required to trigger even the lowest mandatory minimum of five years under § 841(b)(1)(B). *Chapman*, 500 U.S. at 458, 111 S.Ct. at 1923–24. On the other hand, a single dose on a sugar cube will involve 2.27 grams—well in excess of one gram, and thus requiring a five-year sentence under § 841(b)(1)(B). And a single dose in an eight-ounce glass of juice will involve 226.85 grams, a quantity 22 times larger than necessary to require a 10–year mandatory minimum penalty.

A transfer of five doses will produce drastically different sentences depending on whether the doses are contained in capsules, blotter paper, or sugar cubes. If the Commission's standard weight of .4 mg per dose governed for all purposes, in each case the aggregate weight of the five doses would be 2 mg, calling for a sentence at level 12 (for less than 50 mg of LSD) or 10–16 months for a first offender. But if actual weights were used, the results would be as follows: for a transaction done in gelatin capsules, the weight would be 11.25 mg (5 × 2.25 mg), the base offense level would be 12, and the sentence would be 10–16 months. The actual weight of a transaction done on ¼ inch blotter

---

**3.** The Sentencing Commission found that dosage weights vary from .02 mg to .08 mg, and noted that the DEA describes a standard dose as containing .05 mg of LSD. USSG App.C, amend. 488.

**4.** A gelatin capsule weighs 2.20 mg (or 44 times as much as the LSD); a square of blotter paper

approximately 13.95 mg (or 279 times as much); and a sugar cube 2.22 grams (or 44,400 times as much). These figures are derived from the table in *Chapman*, 500 U.S. at 458 n. 2, 111 S.Ct. at 1924 n. 2.

**5.** *Chapman*, 500 U.S. at 466, 111 S.Ct. at 1928.

squares would come to 70 mg (5 × 14 mg), producing an offense level of 14 and a sentence for a first offender of 15–21 months—not drastically different from the gelatin capsules. But if sugar cubes were used, the actual weight would be 11.35 grams (5 × 2.27 grams) and the mandatory ten-year sentence of Section 841(b)(1)(A) would apply. The switch from capsules to sugar cubes takes the sentence from 10 months to 10 years.[6]

There is no moral, social or penological objective to be served by those disparities. Morally and socially irrelevant choices of carrier will determine whether the defendant spends a few months, five years, or ten years in jail. These discrepancies led Judge Richard Posner to observe that "[t]o base punishment on the weight of the carrier medium makes about as much sense as basing punishment on the weight of the defendant." *Marshall*, 908 F.2d at 1333.

The irrationality of using the full weight of the carrier medium for LSD is further illustrated by comparing LSD to other common illegal drugs subject to the mandatory statute. Section 841(b)(1) requires a ten-year mandatory minimum sentence for possession of one kilogram of heroin or five kilograms of cocaine. A kilogram of heroin already diluted to street levels of purity will involve thousands of doses, as will five kilograms of cocaine.[7] In no reasonable case could a kilogram of heroin, or five kilograms of cocaine, constitute a single dose. What an amazing contrast to ten grams of LSD (the amount that triggers a ten-year mandatory sentence), which, as noted above, is achieved

twenty times over by a single dose served in a glass of juice.

I recognize that these irrationalities are of no consequence for us if they result from the command of a statute that the Supreme Court has found to be constitutional.[8] I submit, however, that neither § 841, nor the *Chapman* ruling, requires these absurd results, and that courts are free to accept interpretive guidance from the Sentencing Guidelines that would produce a more rational sentencing scheme. The Supreme Court, of course, did find in *Chapman* that the inclusion of carrier medium was not irrational. 500 U.S. at 465, 111 S.Ct. at 1927. That is because the carrier serves a function in the LSD trade. *Id.* at 466, 111 S.Ct. at 1928. Here, however, the question is different. It is not, as in *Chapman*, a question of whether to *exclude* the carrier. The question is whether the Commission's chosen method for *including* the carrier medium in calculating Guidelines sentences should also apply in determining mandatory minimum sentences. If the courts adopted the Commission's formula to account for LSD carriers by a standardized weight, these irrational and unwarranted disparities would largely disappear.

## C. The bearing of Chapman

The majority opinion (as well as the majority of courts that have considered the issue),[9] interpret *Chapman* as holding that courts must include the entire weight of LSD carrier substances to determine the weight of the "mixture or substance" under § 841. Without question, the *Chapman* opinion used

6. Per unit weights are derived from the table set forth in *Chapman*, 500 U.S. at 458 n. 2, 111 S.Ct. at 1924 n. 2.

7. Single dose bags of heroin purchased on the street generally contain 20 to 50 mg of powder (irrespective of purity). A kilogram of diluted powder contains from 20,000 to 50,000 doses.

8. The Supreme Court ruled in *Chapman* that sentencing according to the actual weight of the carrier was not so irrational as to violate due process or equal protection. 500 U.S. at 465–66, 111 S.Ct. at 1927–28. That ruling, however, did not disagree with any of the illogicalities pointed out above. The Court's point was rather that the Constitution tolerates a high degree of irrational-

ity for a specific application, so long as some rational basis can be found for Congress's overall sentencing scheme. Given the logic of "assign[ing] more severe penalties to the distribution of larger quantities of drugs," *id.*, together with the value of "seeking to avoid arguments about the accurate weight of pure drugs which might have been extracted from blotter paper," *id.* at 466, 111 S.Ct. at 1928, the Court found that Congress's decision to base sentencing on the mixture, rather than on the pure drug involved, passed constitutional muster.

9. *See United States v. Neal*, 46 F.3d 1405, 1409 (7th Cir.1995); *Andress*, 47 F.3d at 840; *United States v. Hanlin*, 48 F.3d 121, 125 (4th Cir.1995); *Boot*, 25 F.3d at 55.

words conveying that message. It stated, for example, that "so long as it contains a detectable amount [of a drug], the entire mixture or substance is to be weighed when calculating the sentence." 500 U.S. at 459, 111 S.Ct. at 1924.[10]

An answer, however, cannot be properly understood without considering the question. The issue being argued to the Court was whether, in the case of LSD, carrier media should be *excluded* from the quantification of the "mixture or substance." The petitioner-defendants argued that because of the peculiar characteristics of LSD, carrier should be altogether excluded (like, for example, the glassine envelopes or foil packages in which heroin and cocaine are sold). The Court thus began its analysis by stating, "[p]etitioners argue that § 841(b) should not require that the weight of the carrier be included when computing the appropriate sentence for LSD distribution." 500 U.S. at 458, 111 S.Ct. at 1923.[11]

The question confronting the Court thus appeared to present only two possible answers: include the carrier medium or exclude it. The Court rejected the argument for exclusion, expressing that rejection through the seemingly equivalent statement that the entire weight of the carrier medium must be included. But, in the context of *Chapman*, the Court's assertion that the weight of carrier medium is to be included could mean nothing more than the Court's rejection of the argument for exclusion.

After the Sentencing Commission adopted Amendment 488 more than a year later, it became apparent that the issue offers more than two options. Refusal to exclude the weight of the carrier does not necessarily require inclusion of the full weight of the carrier. The Commission's new rule now shows that the carrier can be included in different ways. To avoid enormous unwarranted disparities caused by functionally irrelevant differences between one carrier and another, the Commission devised a formula that adopts a uniform carrier weight per dose. The Supreme Court cannot reasonably be said to have rejected that approach, because it never considered the issue. *See United States v. Muschik*, 49 F.3d 512, 516 (9th Cir.1995) (Amendment 488 presents a "third option").

The lower courts, of course, owe deference to the Supreme Court. But to treat a new question as if decided, because the Supreme Court's language seems on superficial reading to answer it, goes beyond deference. *United States v. Hurley*, 63 F.3d 1 (1st Cir. 1995).[12] It abdicates our responsibility and disserves the Supreme Court itself. The Court is entitled to the benefit of lower courts' judgment before it considers a new question. *Austin v. United States*, —— U.S. ——, ——, 113 S.Ct. 2801, 2812, 125 L.Ed.2d 488 (1993) (remanding to court of appeals, which "thought it was foreclosed" from considering 8th Amendment question, because "[p]rudence dictates that we allow the lower courts to consider [this] question in the first instance"). When we treat an issue as foreclosed, which in fact was never considered,

10. The opinion also stated, "[t]he statutory language and structure indicate that the weight of a carrier should be included as a 'mixture or substance containing a detectable amount' of LSD when determining the sentence for an LSD distributor." 500 U.S. at 463, 111 S.Ct. at 1926.

11. The Court also noted petitioner's argument that "[b]ecause LSD is sold by dose, rather than by weight, the weight of the LSD carrier should not be included when determining the defendant's sentence because it is irrelevant to culpability." 500 U.S. at 458, 111 S.Ct. at 1923.

12. *Hurley* raised the question whether "reckless disregard" of an anti-structuring law would satisfy the statutory requirement of willfulness. In *Ratzlaf v. United States*, —— U.S. ——, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), the Supreme Court, rejecting the government's argument that no

awareness of illegality was required, stated that "to give effect to the statutory 'willfulness' specification, the Government ha[s] to prove [the defendant] knew the structuring he undertook was unlawful." *Id.* at ——, 114 S.Ct. at 658. The First Circuit in *Hurley* observed that, notwithstanding this statement, the Supreme Court had not considered—and therefore had not decided— whether reckless disregard would also satisfy the requirement of willfulness. It therefore proceeded to rule that reckless disregard of illegality did indeed satisfy the statute. *Hurley*, 63 F.3d at 14 ("*Ratzlaf* did not formulate any precise instruction. Should the Supreme Court address the issue again, it might insist on actual knowledge and nothing less. But '... disregard' is part of a standard instruction on willfulness.").

we deprive the Supreme Court of our prior analysis as a testing ground for the decision it must eventually make.

The fact that the Supreme Court has recently granted certiorari to consider this question in the case of *United States v. Neal,* 46 F.3d 1405 (7th Cir.1995), *cert. granted,* —— U.S. ——, 115 S.Ct. 2576, 132 L.Ed.2d 826 (1995), suggests that the Court itself does not consider the question to have been decided by *Chapman;*[13] it would not likely have granted certiorari merely to reiterate a decision recently made. Because a majority of the courts of appeals have treated the *Chapman* dictum as conclusive of an issue never considered, the Supreme Court will have virtually no guidance from lower courts on this question of first impression. I conclude that the Supreme Court's decision in *Chapman* is simply neutral as to this question. Assuredly, *Chapman* tells us that the carrier may not be excluded in computing the weight of a mixture or substance containing LSD under § 841. It tells us nothing, however, as to whether that inclusion must be achieved by adding the carrier's full weight, or whether courts should adopt the standard multiplier that the Sentencing Commission has promulgated for use under the Guidelines to avoid unwarranted sentencing disparities resulting from the differing weights of different carriers.[14]

### D. The Commission's rule is consistent with § 841(b).

Section 841(b)(1) requires consideration of the "mixture or substance containing a de-tectable amount" of LSD. 21 U.S.C. § 841(b)(1). The Supreme Court ruled in *Chapman* that this statutory command precludes a sentencing assessment based solely on the pure drug without consideration of the carrier. If the weight assessment promulgated by the Amendment were incompatible with this command, there would be no question for debate. But the Commission's approach is not incompatible with the statute or with *Chapman.*

In its Commentary to Amendment 488, the Commission takes pains to point out that its formula assigns weight to carrier media. What is more, it explains that it does so in order to comply with the *Chapman* decision and § 841. The Commentary explains that the Commission deliberately "selected [a dosage weight that] exceeds the ... standard dosage unit for LSD of 0.05 milligram (*i.e.* the quantity of actual LSD per dose)." USSG § 2D1.1, comment. (backg'd). This was done "in order to assign some weight to the carrier medium." *Id.* (The .4 milligram multiplier is approximately eight times the weight of the drug.) The Commission explains that "the inclusion of some weight attributable to the carrier medium recognizes (A) that offense levels for most other controlled substances are based upon the weight of the mixture containing the controlled substance without regard to purity, and (B) the decision in *Chapman v. United States,* 500 U.S. 453, 111 S.Ct. 1919, 114 L.Ed.2d 524 (1991) (holding that the term 'mixture or

---

**13.** Unfortunately, the grant of certiorari puts the question, once again, as whether the "amendment to [the] Sentencing Guidelines ... change[s] [the] manner of computing [the] weight of LSD for purposes of [§ 841(b)(1)]." —— U.S. ——, 115 S.Ct. 2576, 132 L.Ed.2d 826 (1995). Because the Guidelines cannot amend a statute, the answer to this question seems preordained. I hope the Supreme Court will also consider the question whether courts may, and should, voluntarily take guidance from the Commission's new rule in interpreting the statute.

**14.** A further reason to view *Chapman* as not controlling is that the Supreme Court's decision was influenced by the fact that the Sentencing Guidelines at that time required inclusion of the full weight of the carrier medium. *Chapman* noted that for this reason Guideline sentences for 100 doses of LSD would vary between 10–16 months for pure LSD to 188–235 months if the doses were embedded in sugar cubes. 500 U.S. at 458 n. 2, 111 S.Ct. at 1924 n. 2. The fact that the Commission has changed a rule that furnished support for the Supreme Court's opinion raises some question whether the Supreme Court would adhere to their holding. However, I rest little or no weight on that consideration for my argument. In the first place, the reference to the Commission's prior rule occurs in a footnote, suggesting that the Supreme Court did not rest its decision heavily on the Commission's use of full weight of the carrier medium to control Guideline sentences. The far more important point is that the Supreme Court in *Chapman* in fact did not decide that full weight should be used; it decided only that the carrier should not be excluded.

substance' in 21 U.S.C. § 841(b)(1) includes the carrier medium in which LSD is absorbed)." *Id.* In short, because the measurement approach of Amendment 488 includes the carrier medium (unlike the defendants' position in *Chapman*), it satisfies *Chapman* and the directive of § 841 to include the "mixture or substance" containing LSD. *United States v. Stoneking,* 60 F.3d 399, 408 (8th Cir.1995) (en banc) (Beam, *J.,* dissenting).

Nor is there reason to think the Commission's formula contravenes the intent of Congress in passing the LSD provisions of § 841(b)(1). To the contrary, the use of the Commission's formula would bring mandatory sentences for LSD into conformity with mandatory sentences provided for other drugs. The application of the .4 milligram rule to LSD under § 841(b) would result in mandatory five-year sentences for 2,500 doses, and mandatory ten-year sentences for 25,000 doses. The mandatory five- and ten-year sentences for heroin and cocaine offenses come into play for quantities that involve similar numbers of individual doses.[15] The ten gram quantity of LSD Congress selected as triggering the ten year mandatory sentence does not come into play, where the LSD is unmixed, in liquid form, short of 200,000 doses. It seems most unlikely Congress realized that, owing to the unusual characteristics of LSD, the ten year sentence might also be triggered by a single dose. Although it is difficult to guess at the intentions of Congress, I would surmise, based on the other dosage volumes that Congress selected to trigger mandatory sentences, that those intentions would be far better achieved by the application of the Commission's formula than by an interpretation that requires a mandatory ten-year sentence for a first offender who passes a single glass of LSD-laced juice at a party (or indeed for any single-dose offender).

Nor is Amendment 488 inconsistent with Congress's intent to adopt a "market-oriented" approach to drug sentencing. *Chapman,* 500 U.S. at 461, 111 S.Ct. at 1925;[16] *Muschik,* 49 F.3d at 517. The Commission's multiplier formula bases punishment of LSD offenses on the actual number of doses held. This is particularly appropriate because LSD is sold by dose, rather than by weight. *Muschik,* 49 F.3d at 517. Neither price nor the number of purchases increase when LSD is sold in capsules, as opposed to sugar cubes or blotter paper. Note, *Let the Punishment Fit the Crime: State v. Newton, Chapman v. United States, and the Problem of Purity and Prosecutions,* 52 La.L.Rev. 1267, 1279–80 (1992). To sentence LSD offenses based on the full weight of the carrier utterly fails to further Congress's objective of punishing dealers according to the volume of drugs reaching consumers in the market. *See Marshall,* 908 F.2d at 1334 (Posner, *J.,* dissenting).

*E. The Commission's Commentary does not rule out application of its measurement formula to § 841*

I agree unhesitatingly with the majority that Amendment 488 does not direct courts to use its method of measuring LSD carrier weight for determining mandatory minimum sentences under § 841. Indeed, the Commentary asserts that "this approach does not override the applicability of 'mixture or substance' for the purpose of applying any mandatory minimum sentence (*see Chapman;* § 5G1.1)." USSG § 2D1.1, comment. (backg'd).

The majority, however, takes a more controversial position which seems to me to go too far. It finds in this last quoted sentence

---

15. *See* footnote 7, *supra.*

16. *Chapman* noted that Congress adopted a market-oriented approach based on the quantity of consumable narcotics, whether pure or dilute, in preference to one based solely on the volume of pure drug. *Id.* PCP is an exception to this disregard of purity. Section 841(b)(1)(B) provides for sentencing based *either* upon "10 grams or more of phencyclidine (PCP) *or* 100 grams or more of a mixture or substance containing a detectable amount of phencyclidine (PCP)...." 21 U.S.C. § 841(b)(1)(B)(iv) (West Supp.1988) (emphasis added). The Commission expressly noted, furthermore, that its amendment brought LSD sentences into conformity with those for PCP. USSG § 2D1.1, comment. (backg'd).

a "plain meaning"[17] and "express[ ] state[ment]" instructing courts *not* to use the approach of Amendment 488 in connection with § 841, maj. op. at 759–60, which we must treat as "authoritative" under *Stinson v. United States,* —— U.S. ——, ——, 113 S.Ct. 1913, 1915, 123 L.Ed.2d 598 (1993).

The majority argues that the Commission would not have used the phrase "does not override" unless it meant that the revised approach was inconsistent with *Chapman.* Maj. op. at 759. "Nor would it have cited to section 5G1.1(b), the Guideline that acknowledges the primacy of the statutory mandatory minimum sentence over a Guidelines sentence." *Id.* I see no logic in these arguments.

The sentence is obscure. What the Commission meant by it is difficult to fathom. Whatever it was intended to mean, it is most certainly not an "express statement" with a "plain meaning." The dissent from the Seventh Circuit's opinion in *Neal* reads the sentence not as a direction at all, but merely a factual observation that the new measurement system does not conflict with the obligation to include mixture or substance. *Neal,* 46 F.3d at 1416 (Ripple, *J.,* dissenting). This interpretation is bolstered by the text preceding the Commission's comment, which takes pains to point out the consistency of the new guidance with the obligation under *Chapman* and § 841 to include the carrier.

A second possibility is that the sentence signifies merely a recognition by the Sentencing Commission of the limits of its authority and undertaking. It says nothing more than that Amendment 488 does not purport to instruct courts how to interpret the mandatory minimum statute, leaving this interpretive task to the courts. The reference to USSG § 5G1.1, which the majority sees as the clincher, may be nothing more than a recognition that, however the courts interpret the mandatory sentence statute, its command will of course prevail over guideline prescriptions. *See Stoneking,* 60 F.3d at 408 (Beam, *J.,* dissenting) (issue is not whether Commission intended its approach to "override" the mandatory minimum statute, since it "clearly cannot," but whether statute prohibits the guideline approach).

We can only guess at what this sentence signifies. It seems to me, however, that the least likely of its several possible meanings is an instruction to the courts that they should continue to sentence under § 841(b)(1) in the manner which the Commission finds in the preceding paragraph to "produce unwarranted disparity." I can find nothing in the Guidelines' commentary or rules to support the conclusion that the Commission's intentions would be undermined if courts took guidance from Amendment 488 and applied it to the mandatory statute as well.

What the Commission has expressly stated in the same Commentary is that "basing offense levels on the entire weight of the LSD and carrier medium would produce unwarranted disparity." USSG § 2D1.1(c), comment. (backg'd). It has expressly stated that its approach will "avoid an undue influence of varied carrier weight on the applicable offense level." *Id.* It has taken pains to suggest that its measurement method "recognizes ... the decision in *Chapman* ... holding that the term 'mixture or substance' in 21 U.S.C. § 841(b)(1) includes the carrier medium." *Id.* What earthly sense would it then make for the Commission to command that courts not use this enlightened method when formulating statutory sentences?

It is clear that the same unwarranted disparities and "undue influence of varied carrier weight" will occur under the mandatory statute, just as under the Guidelines. It is clear that the Commission believes its approach to measuring LSD weight is more reasonable. It would thus be bizarre beyond comprehension for the Commission to direct courts not to employ this enlightened approach when interpreting the statute. It seems most unlikely that the Commission intended by this sentence to instruct courts that they should continue to use a measurement system that the Commission finds so problematic. As I read the amended text of Guideline § 2D1.1 in its totality, it tells us

---

17. The majority writes, "[t]he plain meaning of the Commentary ... is that *Chapman*'s holding as to use of the actual weight of the medium continues to apply for purposes of mandatory minimum sentences." Maj. op. at 760.

that use of the full weight of the carrier produces unwarranted disparities; it tells us how to measure mixture or substance containing LSD to find the appropriate base offense level under the Guidelines; and it simply refrains from instructing courts how to compute "mixture or substance" for the purpose of mandatory minimums required by § 841(b)(1).[18]

### F. The function of the Commission; the duty of the court; and the appropriateness of deference

The Commission has neither told courts to apply its formula to § 841(b), nor instructed them not to do so. The question nonetheless arises whether courts may borrow wise solutions promulgated by the relevant administrative agency in determining a closely related issue.

There is no legal obstacle to courts doing so. It has never been suggested that courts must ignore administrative expertise whenever they are not required to defer to it. *See United States v. Hill,* 48 F.3d 228, 231 (7th

Cir.1995) (Posner, *J.*) (nonbinding policy statements in Sentencing Guidelines are nonetheless "entitled to great weight because the Sentencing Commission is the expert body on federal sentencing"); *United States v. Sparks,* 19 F.3d 1099, 1101 (6th Cir.1994) (courts must consider advisory policy statements in Chapter 7 of Sentencing Guidelines). The role of the Sentencing Commission, as mandated by statute, invites such deference. Its task is not limited to the creation of the Sentencing Guidelines. It is charged, first of all, with "establish[ing] sentencing policies and practices for the Federal criminal justice system." 28 U.S.C. § 991(b)(1). The policies and practices it is charged to promulgate must "(A) assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2) [discussed below] ...; (B) provide certainty and fairness ..., avoid[ ] unwarranted sentencing disparities ... and (C) reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process." 28 U.S.C. § 991(b)(1).[19] Each of these aspects of the Commission's statutory

---

**18.** The legislative history of Amendment 488 includes a statement slightly more favorable to the majority's argument. The historical commentary accompanying the Amendment largely duplicates the language incorporated into the amended Guidelines Commentary. Its last sentence, however, is slightly different. It states "Nonetheless, this approach does not override the *definition* of mixture or substance for purposes of applying any mandatory minimum sentence." USSG App.C, amend. 488 (emphasis added).

Although this sentence better supports the majority's argument than the version adopted in the new Guidelines Commentary, I would still not read it as a direction by the Commission to courts that they should continue to construe § 841(b)(1) by including the full carrier weight. This is for several reasons. First, as noted above, such an intention would be incompatible with the immediately preceding explanation that use of the Commission's formula avoids unwarranted disparity and conforms to *Chapman* and the statute. Second, if that was what the Commission intended, it would be odd that the version incorporated into the Guidelines failed to communicate the same message. Third, this language is altogether compatible with a far more likely meaning. Stating that a Commission commentary "does not override" a statutory definition is merely stating the obvious—a recognition of the limits of the Commission's power. It cannot override a statutory definition, and recog-

nizes that the function of interpreting statutes belongs to courts. Finally, in any event, this is mere legislative history and not a reliable source for the meaning of the amendment, especially where it is in tension with the amendment itself. *See Pope,* 58 F.3d at 1569 (citing *Stinson,* — U.S. at —, 113 S.Ct. at 1915 (where commentary and guideline it interprets are inconsistent, the Sentencing Reform Act commands compliance with the guideline)).

**19.** The full text of § 991(b)(1) provides that the Commission shall:

(1) establish sentencing policies and practices for the Federal criminal justice system that—
(A) assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2) of title 18, United States Code;
(B) provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices; and
(C) reflect, to the extent practicable, advancement in knowledge of human behavior as it relates to the criminal justice process....

28 U.S.C. § 991(b)(1).

mission undoubtedly relates directly to the problem of assessing LSD sentences.

Moreover, in the pursuit of these objectives the Commission has developed enormous expertise in sentencing matters. The Supreme Court has previously recognized with respect to the Sentencing Commission that, "[d]eveloping proportionate penalties for hundreds of different crimes ... is precisely the sort of intricate, labor-intensive task for which delegation to an expert body is especially appropriate." *Mistretta v. United States*, 488 U.S. 361, 379, 109 S.Ct. 647, 658, 102 L.Ed.2d 714 (1989). *See also United States v. R.L.C.*, 503 U.S. 291, 298, 112 S.Ct. 1329, 1334, 117 L.Ed.2d 559 (1992) (courts imposing sentences under Juvenile Delinquency Act must also refer to punishments authorized under Sentencing Guidelines, which "limit the legitimacy of [courts'] exercise of [sentencing] power").

It is quite common for courts, in the absence of directly applicable administrative rulings, to look to agency policy for guidance in statutory interpretation. Indeed, we have examples that closely parallel this case.

Section 1B1.3(a)(1)(B) of the Sentencing Guidelines directs courts, in cases of "jointly undertaken criminal activity," to consider as relevant conduct "all reasonably foreseeable acts" of the defendant's co-conspirators to determine the defendant's base offense level. USSG § 1B1.3(a)(1)(B). In the case of a drug conspiracy, this will make the defendant responsible, on the vertical base-offense-level axis, for quantities of drugs contemplated by his co-conspirators, if their conspiring as to these quantities was "reasonably foreseeable" to the defendant. This Guideline section conveys no suggestion whatsoever that it also applies to the calculation of drug quantities for purposes of mandatory minimum sentences under 21 U.S.C. §§ 841(b)(1) and 846.

In *United States v. Martinez*, 987 F.2d 920 (2d Cir.1993), the government contended that the defendant should be held responsible under § 841(b)(1) for all quantities that were included in the conspiracy of which he was a part, without applying the "reasonably foreseeable" limitations of the Guideline. *Id.* at 924. This court disagreed. We held that, where the Guideline was not inconsistent with the statute, we would, in the interest of fashioning a rational structure of sentencing laws and harmonizing the Guidelines with the mandatory minimum statute, adopt the Guidelines standard of culpability for the §§ 841(b)(1) and 846 statutory minimums. *Id.* at 925–26. We explained that to adopt the government's arguments for sentencing under §§ 841(b)(1) and 846 "would be devastating to the Guidelines approach" because of the disparity it would create between sentences covered by the Guidelines and those covered by the statutory minimums. *Id.* at 926. Other circuits have reached the same result. *See United States v. Young*, 997 F.2d 1204, 1210 (7th Cir.1993); *United States v. Irvin*, 2 F.3d 72, 78 (4th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1086, 127 L.Ed.2d 401 (1994).

*Martinez* is closely analogous to our situation.[20] In each case the Commission has promulgated guidance and commentary directed only to the Guidelines and not to the interpretation of the statutory minimums prescribed by § 841. Nonetheless, the rational harmony of the overall sentencing scheme favors consistency in interpretation. *United States v. McFadden*, 13 F.3d 463, 467 (1st Cir.1994) (Breyer, *C.J.*, dissenting) (given importance of guidelines system to Congress, courts should try to reconcile sentencing guidelines and mandatory minimum statutes to greatest degree possible "in light of their purposes and common sense"); *Irvin*, 2

---

20. I recognize that our adoption of the standards of the Relevant Conduct Guideline in *Martinez* was somewhat closer to traditional statutory interpretation because that standard was consistent with the judicial doctrine of *Pinkerton v. United States*, 328 U.S. 640, 647–48, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946) (a conspirator is responsible for the substantive crimes of another committed in furtherance of the conspiracy only to the extent those acts were reasonably foreseeable). *Martinez*, 987 F.2d at 926. None-

theless, in interpreting the mandatory statute, our court and others have expressly relied on the Commission's guideline rule and its expertise. *See id.* at 925–26; *Irvin*, 2 F.3d at 77 ("Although not controlling of our decision, we find support for our interpretation of §§ 841(b) and 846 in the sentencing guidelines."); *United States v. Jones*, 965 F.2d 1507, 1517 (8th Cir.) (same), *cert. denied*, —— U.S. ——, 113 S.Ct. 346, 121 L.Ed.2d 261 (1992).

F.3d at 78 (mandatory minimum and sentencing guidelines schemes "should be reconciled to the extent legitimate and practical").[21]

Courts frequently borrow agency interpretations in other contexts as well, where *Chevron* deference is not required. As an example, federal courts have long analyzed antitrust claims according to the measurements outlined in the Justice Department's Merger Guidelines. The Merger Guidelines were promulgated in 1968 to aid officials of the Department of Justice in deciding whether to prosecute antitrust violations. They are periodically published to notify business interests of the standards being applied by the government in exercising its discretion. Although it is widely acknowledged that the Merger Guidelines do not bind the judiciary in determining whether to sanction a corporate merger or acquisition for anticompetitive effect, *Fruehauf Corp. v. Federal Trade Comm'n*, 603 F.2d 345, 353 (2d Cir.1979), courts commonly cite them as a benchmark of legality. *See* Steven A. Newborn & Virginia L. Snider, *The Growing Judicial Acceptance of the Merger Guidelines*, 60 Antitrust

L.J. 849, 851 (1992) (noting over 75 judicial citations to Merger Guidelines since 1982).[22] It is altogether appropriate for courts to draw on a wise and helpful administrative solution devised for use in one context and apply it to the same issue arising in a different context.

The majority argues, citing our decision in *United States v. Palacio*, 4 F.3d 150 (2d Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1194, 127 L.Ed.2d 543 (1994), that the Sentencing Commission lacks the authority to displace a prior judicial interpretation of a statutory term. Once again this seems to me to misconceive the question. The issue here is not whether courts *must* take direction from an agency ruling, but whether they may voluntarily accept such guidance for the purpose of achieving a satisfactory statutory interpretation. We decided in *Palacio* that, having first rejected a proposed statutory interpretation, we would not be compelled to reverse our ruling by an intervening administrative interpretation. That decision has no bearing on whether courts *may* alter their interpretation of a statute, by voluntarily ac-

**21.** Courts also use particular Sentencing Guidelines, or their accompanying commentary, to provide a rule for the interpretation of a different analogous guideline. In *United States v. Kim*, 896 F.2d 678 (2d Cir.1990), we used commentary written for departures on the criminal history horizontal axis, and applied it to departures on the vertical axis. In *United States v. Cervantes*, 878 F.2d 50, 53 (2d Cir.1989) and *United States v. Coe*, 891 F.2d 405, 409, 412 (2d Cir. 1989), we interpreted the text of § 4A1.3 to bar the sentencing judge from moving directly from an inadequate Criminal History Category to the appropriate sentence, but to require the court to consider the adequacy of the next higher category in sequence before moving to another. *Coe*, 891 F.2d at 412. Although we had expressly noted in *Coe*, *id.* at 409, that the guidelines text did not impose the same procedural requirement on vertical axis departures made under Part 5K of the Guidelines, we later in *Kim*, 896 F.2d at 685, imposed the procedural requirements derived from § 4A1.3, governing horizontal axis criminal history departures, to departures under Part 5K. The requirement was later abandoned as impractical. *See United States v. Rodriguez*, 968 F.2d 130, 140 (2d Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 140, 121 L.Ed.2d 92 (1992).

**22.** For example, courts have relied upon the Merger Guidelines' listed indicia of "nonentry" factors suggestive of non-monopoly power, *Unit-*

*ed States v. Baker Hughes, Inc.*, 908 F.2d 981, 985 (D.C.Cir.1990); its definition of relevant product market, *New York v. Kraft General Foods, Inc.*, 1995 WL 77881, at *44 (S.D.N.Y.1995); and its indicia for determining collusive behavior, *United States v. Archer–Daniels–Midland*, 781 F.Supp. 1400, 1423 (S.D.Iowa 1991). Indeed, with respect to measuring market concentration, courts typically adopt the Guidelines' recommended formula as the industry standard. *See, e.g., Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins.*, 784 F.2d 1325, 1336 (7th Cir.1986); *Bon–Ton Stores, Inc. v. May Dept. Stores Co.*, 881 F.Supp. 860, 875 (W.D.N.Y.1994).

Courts have deferred to the Guidelines in this complex area of law, among other reasons, because (1) notwithstanding the court's ultimate authority, the agency which promulgates them has primary responsibility for enforcing the antitrust rules, *Allis–Chalmers Mfg. Co. v. White Consol. Indus., Inc.*, 414 F.2d 506, 523 (3d Cir.1969), *cert. denied*, 396 U.S. 1009, 90 S.Ct. 567, 24 L.Ed.2d 501 (1970); and (2) because it is simply good policy that agency practice be interpreted as consistently as possible with binding case law, *Community Publishers, Inc. v. Donrey Corp.*, 892 F.Supp. 1146, 1161 n. 14 (W.D.Ark.1995). These rationales speak equally to the propriety of judicial attention to the Sentencing Commission's policies in criminal sentencing generally.

cepting uncompelled guidance from a constructive administrative interpretation, in order to avoid irrational results. It would be an odd rule indeed that forbade courts from doing so.[23]

Indeed, the general statutory mandate governing the imposition of sentences, 18 U.S.C. § 3553(a), directs courts to fashion a rational harmonious sentencing policy, furthering the enumerated goals of sentencing. The statute directs the court to impose a sentence "sufficient, but not greater than necessary" to accomplish the stated goals, including "the need for the sentence ... (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant." More directly on point, the statute instructs courts to "consider ... *the kinds of sentence ... set forth in the guidelines* ...; *any pertinent policy statement issued by the Sentencing Commission* ...; *[and] the need to avoid unwarranted sentence disparities* among defendants with similar records who have been found guilty of similar conduct." *Id.* (emphasis added). These goals apply not only in the imposition of individual discretionary sentences but also in the interpretation of relevant sentencing guidelines and statutes.

The objectives set forth in § 3553(a) would be furthered if courts were to interpret § 841(b)(1) in accordance with the Commission's measurement formula. If the presence of a glass of orange juice, which (unlike heroin cut) is immaterial to the harm or volume of drug dealing, increases the sentence from 10 months to 10 years, the sentencing objectives of § 3553(a) are seriously undermined. Such a sentence does not "reflect the seriousness of the offense"; it does not "provide just punishment"; the punishment is vastly "greater than necessary" to protect the public and deter further crimes. Indeed, it creates, rather than avoids, unwarranted disparity, and justifiably promotes disrespect for the law.

Once again, I acknowledge that if such deplorable consequences were *required* by a statute found by the Supreme Court to be constitutional, courts have no choice but to enforce the statute. But when courts have some leeway in the interpretation of statutes, it is surely their duty to make use of it in order to avoid irrational results. *See Public Citizen v. United States Dept. of Justice,* 491 U.S. 440, 454, 109 S.Ct. 2558, 2567, 105 L.Ed.2d 377 (1989) (*citing Church of the Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892)). If, by adopting for purposes of statutory sentences an interpretive rule promulgated by the Sentencing Commission, the courts can avoid such atrocious consequences and can find a harmonious construction for the statute, there can be no good reason to fail to do so. *See United States v. American Trucking Ass'ns, Inc.,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940).

In this instance, the Commission, following its mandate under 28 U.S.C. § 991(b)(1), has reviewed the recent history of sentencing for LSD offenses and identified a serious problem of unwarranted disparities. The Com-

**23.** A second argument that may be advanced against this position is that it is always inappropriate for courts to adopt statutory interpretations that impose technical requirements generally thought legislative in nature. To interpret the weight of mixture or substance containing LSD to mean .4 milligram for each dose is such a bright-line rule. There are two answers to this concern.

The first is that, although judicial formulation of bright-line solutions is unusual, it is not without precedent. *See, e.g., County of Riverside v. McLaughlin,* 500 U.S. 44, 58–59, 111 S.Ct. 1661, 1671, 114 L.Ed.2d 49 (1991) ("prompt" processing of criminal suspects requires determination of probable cause within 48 hours); *United States v. Thirty–Seven Photo-*

*graphs,* 402 U.S. 363, 373–74, 91 S.Ct. 1400, 1407, 28 L.Ed.2d 822 (1971) (requiring that judicial proceedings for forfeiture of obscene materials under 19 U.S.C. § 1305(a) commence within 14 days and conclude within 60 days).

Second, in this case the court is not asked to originate a legislative solution. The question is whether courts will take an administrative formula promulgated to determine the weight of LSD under one set of rules, and apply it to the same question arising under a statutory rule. Accordingly, the court is not involved in rulemaking of a legislative character, but simply adapts a reasonable administrative ruling of that character to the judicial interpretation of a statute.

mission has ingeniously solved the problem of disparities in Guidelines sentencing by adopting uniform carrier weight for such offenses. We need not ignore those findings, nor the Commission's very sensible cure, in interpreting statutory penalties under § 841(b)(1).

The Commission's solution to the problem of unwarranted disparities will be ineffectual as long as courts interpret § 841(b) to require a five- or ten-year mandatory minimum sentence whenever a single dose of LSD is combined with a sugar cube or beverage. Under this interpretation, even in trivial cases the weight of the carrier for a single dose will displace the Guidelines and perpetuate the sentencing disparities the Commission sought to escape. There will be no harmonious or logical consistency in the sentencing of LSD cases, but rather a system characterized by steep, arbitrary cliffs separating guidelines from statutes, and drastic consequences following from morally irrelevant details.

I return to the initial two-part question—whether courts may, and whether they should, defer to the Commission's expertise and wisdom by voluntarily adopting its Guidelines formula for use in statutory sentences. There can be no doubt we may do so, if we read the *Chapman* opinion as settling only those questions the Supreme Court actually considered. As to whether we should, the application of the Commission's formula to the statute would produce a rational, fair and harmonious sentencing scheme for LSD offenses, in place of one that is arbitrary, irrational, and inconsistent. It would also better serve the intentions of Congress than an interpretation that produces such quirky and indefensible results. What better reasons can we ask? I therefore respectfully dissent.